No. 83-244

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

BARNEY REAGAN,

       Plaintiff and Respondent,

  -vs-

UNION OIL COMPANY OF CALIFORNIA,
a corp., and THE MONTANA POWER CO.,
a corp.,

       Defendants and Respondents.

---

APPEAL FROM:  District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable ~~Frank Davis~~, Judge presiding.
Frank E. Blair

COUNSEL OF RECORD:

    For Appellant:

        Jardine, Stephenson, Blewett & Weaver; Curtis G.
Thompson and Alexander Blewett argued, Great Falls,
Montana

    For Respondents:

        Poore, Roth & Robinson; C. Richard Anderson and
Robert Poore argued, Butte, Montana

---

Submitted:  November 17, 1983

Decided:  January 23, 1984

Filed: JAN 23 1984

*Ethel M. Harrison*

---
Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

This case comes on appeal from an order granting plaintiff's motion for partial summary judgment on September 14, 1982, by the District Court of the Second Judicial District, Silver Bow County. We vacate the order of the District Court.

Pursuant to a 1944 agreement, Reagan's predecessor in interest and his associates (Reagan Associates) owned a twenty percent "net proceeds" interest in profits derived from production obtained from certain oil and gas leases on the Blackfoot Indian Reservation. The twenty percent "net proceeds" interest was to be paid by Union Oil. Pursuant to an agreement entered into on October 18, 1954, the "net proceeds" interest was converted into a "general obligation and liability" of Union Oil and Montana Power to pay Reagan Associates certain sums of money annually. The reason for converting the "net proceeds interest" to a "general obligation and liability" was that the parties were aware that the Department of Interior might not approve an assignment of an overriding royalty on a Tribal lease.

Under the agreement, the "net proceeds" interest was quit-claimed to Union Oil in return for Reagan Associates receiving a "general obligation and liability" of Union and Montana Power to pay Reagan Associates certain sums of money "measured by and that [were] equal in amount" to a fixed percentage of the value of the petroleum produced. The agreement did not use the terms "royalty" or "overriding royalty" and was silent as to payment of taxes. Plaintiff,

-2-

Barney Reagan, succeeded to ownership of the "general obligation and liability" upon the death of his father in 1969.

Since 1954, Union and Montana Power have deducted from the payments under the agreement certain sums for payment of various state and federal taxes including the following:

(a) Oil and gas conservation tax, Section 82-11-131, MCA.

(b) Oil and gas severance tax, Section 15-36-101, MCA.

(c) Resource indemnity trust tax, Section 15-38-104, MCA.

(d) Oil and gas net proceeds tax, Title 15, Chapter 23, part 6, MCA.

(e) Windfall Profits Tax, 26 USCA Sections 4986 et. seq.

In 1970, Reagan executed and delivered to Union Oil division orders pertaining to the production of oil and gas. The division orders provided that "[t]he undersigned . . . certify and warrant they are the legal owners in the proportions set out . . . of all the oil, and in the proceeds from casinghead gas produced from . . . " Union's Tribal leases.

The division orders stated that payments should be made to the respective parties for amounts due, "less any taxes required by law to be deducted and paid by [Union]." In addition, Section (5) of the division orders provided:

> "It is distinctly understood that the Owners will pay their respective portions of all taxes imposed upon the products produced from said land, including but not by way of limitation, taxes imposed upon the production, severance, gathering and disposition of such products, and if Union pays any such tax on account of the interests of the Owners, the amount so paid may be deducted from payments due

the Owners hereunder."

The central issue before the District Court was whether Union Oil and Montana Power had properly withheld portions of Reagan's annual payments for tax purposes because Regan held a taxable "economic interest."

Reagan filed suit against Union and Montana Power in May, 1981, alleging that the deductions for taxes were in derogation of the 1954 agreement and requesting judgment in the amount of all the sums withheld together with interest from the dates of such withholdings. On June 30, 1982, Reagan moved for a partial summary judgment pursuant to Rule 56(c) of the Montana Rules of Civil Procedure. Union and Montana Power filed opposing briefs on August 19, 1982. On September 14, 1982, the District Court entered its order granting Reagan partial summary judgment. The District Court ordered that any and all payments made pursuant to the 1954 agreement were not subject to the taxes at issue; that contrary to the express provisions of the 1954 agreement, defendants unlawfully withheld money from Reagan; that the money had to be accounted for and returned; and that the defendants were prohibited from any future withholdings. Further, the District Court, upon Reagan's concession, applied the statute of limitation defense raised (Section 27-2-202(1), MCA, and limited Reagan's recovery to amounts withheld during the eight years preceding the commencement of the action. In addition, the District Court denied defendant's motion for leave to conduct further discovery.

On September 23, 1982 the defendants moved the District Court for an order rescinding, amending or modifying its order granting partial summary judgment. On

November 12, 1982, the District Court denied the motion stating ". . . as a matter of law the written contract of the parties of October 18, 1954, created a general obligation and liability of Union Oil and Montana Power and not a economic interest with respect to the oil or gas in place in the ground. This is fatal to Defendant's contentions." Thereafter, defendants filed their notice of appeal.

Appellants, Union Oil and Montana Power, raise six issues on appeal:

(1) Did the Distict Court err in granting respondent's motion for partial summary judgment ruling as a matter of law that there was no genuine issue of material fact as to respondent's payments being non-taxable?

(2) Did the division orders executed by respondent create a question of fact as to authorization by respondent of deduction for taxes?

(3) Was there a question of fact regarding the defense of laches and, as a matter of law, the appellants could not rely on the defense of laches?

(4) Did the District Court's denial of appellants' motion for leave to conduct further discovery, which was filed after submission of respondent's motion for summary judgment, constitute reversible error?

(5) Did the District Court's order granting partial summary judgment on September 14, 1982, and its further order of November 10, 1982, sufficiently explain the basis for granting respondent's motion for partial summary judgment?

(6) Did the District Court err in awarding respondent

-5-

prejudgment interest?

We find the first two issues dispositive of the matter.

The purpose of summary judgment is to encourage judicial economy by eliminating unnecessary trials and an order for summary judgment will be upheld in those cases in which the complaining party fails to demonstrate the existence of material and substantial facts that would alter the decision made below. Cereck v. Albertsons, Inc. (Mont. 1981), 637 P.2d 509, 38 St.Rep. 1986. Summary judgment is never to be used as a substitute for trial if a factual controversy exists. Reaves v. Reinbold (Mont. 1980), 615 P.2d 896, 37 St.Rep. 1500. The standard that an appellate court applies in reviewing a grant or denial of a motion for summary judgment is the same as that utilized by the trial court initially under Rule 56, M.R.Civ.P.--a summary judgment is proper when it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 10 Wright and Miller, Federal Practice and Procedure, section 2716 p. 643. Summary judgment is proper only if the pleadings, depositions, answers to interrogatories and admissions on file show there is no genuine issue of material fact. Anderson v. Applebury (1977), 173 Mont. 411, 567 P.2d 951. If there is any doubt as to the propriety of a motion for summary judgment, it should be denied. Cheyenne Western Bank v. Young (1978), 179 Mont. 492, 587 P.2d 401; Kober v. Stewart (1966), 148 Mont. 117, 417 P.2d 476.

In the present case, the District Court determined that there was no genuine issue of material fact because the

October 18, 1954 contract created a "general obligation and liability" and not an "economic interest" thereby precluding appellants from withholding portions of respondent's annual payments for tax purposes. However, the record indicates there was a genuine issue of fact as to whether the October 18, 1954 agreement created a taxable "economic interest." Although the agreement refers to respondent's payment as a "general obligation and liability," the payments were totally dependent on the amount and value of production. In Forbes v. Mid-Northern Oil Company (1935), 100 Mont. 10, 45 P.2d 673, we said that the nature of the interest is determined by the instrument considered as a whole and not by the labels used by the parties. Similarly, in Palmer v. Bender (1933), 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489, 493, the United States Supreme Court said that the retention of an ownership or legal interest in the oil is not a necessary prerequisite to an "economic interest." An "economic interest" is defined in Treas.Reg., section 1.6.11-1(b)(1) as follows:

> "An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place . . . by any form of legal relationship, income derived from the extraction of the mineral . . . to which he must look for a return of his captial."

Although it would be premature for us to decide whether the October 18, 1954 agreement created an "economic interest," this was a genuine issue of material fact and the District Court erred in granting respondent's motion for partial summary judgment.

In addition, the conduct of the parties in the execution and acquiesence to the terms of the division

orders created a genuine issue of fact. Specifically, the division orders provided that respondent certified and warranted that he was the legal owner of a certain portion of the oil and gas produced by appellants. Moreover, section (5) of the orders states that respondent will pay his respective portion of taxes imposed upon production, including but not by way of limitation, taxes for production, severence and gathering. Section (5) of the division orders also provides, ". . . and if Union pays any such tax on account of the interests of the Owners, the amount so paid may be deducted from payments due the Owners hereunder." Thus, the language of the division orders, if used to supplement the terms of the 1954 agreement, could be construed as a representation of ownership of the oil and gas by respondent and as authorizing the challenged withholdings.

Williams and Meyers, Oil and Gas Law, section 705, p. 451, abridged edition, states:

> "Insofar as the division or transfer order differs from the lease as concerns the measurement of quantity, quality, price or value of the production, the lease provisions are modified by the provisions of the order as to all parties to the unrevoked order. Thus the lease may provide in very general terms for the payment of royalty on production and the division order (or a contract of sale incorporated in the division order by reference) may contain much more specific provisions on the same matters, which may be inconsistent with details of the lease royalty clause. Under such circumstances the provisions of the division or transfer order govern until such order is revoked."

Williams and Meyers, Oil and Gas Law, section 711, p. 455, abridged edition, also states:

> "Where there is disagreement over the

> construction of a particular instrument, the provisions of a division order executed by the parties to such other instrument may be evidence of the proper construction thereof on the theory of contemporaneous construction of the latter instrument by the parties."

We cannot speculate as to what the parties intended, however, summary judgment is usually inappropriate where the intent of the contracting party is an important consideration. Fulton v. Clark (1975), 167 Mont. 399, 538 P.2d 1371; Kober, supra.

The language of the division orders, which is part of the District Court record, raise a doubt as to the propriety of the partial summary judgment and the motion therefore should have been denied. Cheyenne Western Bank, supra. The party opposing a motion for summary judgment must be afforded the benefit of all reasonable inferences which may be drawn from the offered proof. Reaves, supra.

In addition to the language contained in the division orders, the provisions of the tax statutes at issue should have persuaded the District Court to deny respondent's motion for partial summary judgment. For example, the oil and gas severence tax, Section 15-36-101(3), MCA, as well as the resource indemnity trust tax, Section 15-38-104, MCA, allow for the deduction of a pro rata share of the tax from payments made in settlements under division of proceeds orders and other contracts.

In sum, there existed genuine issues as to whether the appellants properly withheld portions of respondent's annual payments and we therefore vacate the decision of the District Court and remand the case for further proceedings.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

-10-

Justice John C. Sheehy, dissenting:

I dissent and would affirm the decision of the District Court granting summary judgment in favor of Barney Reagan.

The majority opinion shows a startling indifference to, or lack of knowledge of, the operation and effect of division orders on their underlying instruments in the oil and gas production business.

The production of oil and natural gas in Montana, at the time of this case, is subject to the following taxes:

1. Oil and Gas Conservation Tax, section 82-11-131, MCA. Under this tax provision, the producer pays the tax for oil or gas "produced for himself, as well as for another, including a royalty owner. . ."

2. An Oil and Gas Severance Tax, section 15-36-101, MCA. Here the producers are required to pay this tax in full for their own account and for the account of each other owner

> "of the gross proceeds in value or in kind of all the marketable . . . oil or natural gas extracted and produced, including owner or owners of working interest, royalty interest, overriding royalty interest, carried working interest, net proceeds interest, production payments, and all other interest or interests owned or carved out of the total gross proceeds in value or in kind"

of such production. Section 15-36-101(3), MCA. That statute also provides "[u]nless otherwise provided in a contract or lease, the pro rata share of any royalty owner or owners will be deducted from any settlements under said lease or leases or division of proceeds orders or other contracts." (Emphasis supplied).

3. A Resource Indemnity Trust Tax, section 15-38-104, MCA. This tax is laid on any person engaged in the business of mining, extracting or producing minerals in Montana. The statute provides further "[u]nless otherwise provided in a

- 11 -

contract or lease, the pro rata share of any royalty owner or owners may be deducted from any settlements under the lease or leases or division of proceeds orders or other contracts." (Emphasis supplied).

4. An Oil and Gas Net Proceeds Tax, section 15-23-607, MCA. This tax includes an assessment of royalties paid to a royalty owner (section 15-23-605), and is payable by the operator or producer who may deduct from the royalty owner an estimated amount of the tax to be paid by him upon the royalty or royalty interest.

5. A Windfall Profits Tax, levied by the Federal government under section 26 U.S.C. § 4986, et seq. The windfall profits tax is laid on the producer of taxable crude oil and gas, and the producer is defined as the "holder of the economic interest with respect to the crude oil." 26 U.S.C. § 4996(a)(1)(A). Internal Revenue regulations provide that a producer is the "holder of the economic interest with respect to the crude oil in place in the ground." IRS reg. 51. 4996-1(b)(1) (Emphasis supplied).

I have stated those tax provisions at length to demonstrate to the reader that the various state taxes are laid upon the producers and the royalty owners of the oil and gas, and in the federal case, upon the owner of the crude oil in place in the ground.

At issue in this case then is who is the owner of the oil and gas rights here in question, the Montana Power Co. and Union Oil Co. on the one hand or Barney Reagan on the other, as one of the Reagan Associates.

Clearly in this case, Montana Power Co. and Union Oil Co. are the owners of the working interest, subject only to the royalty payments to the land owners (in this case, the

tribes). Clearly in this case, Barney Reagan, and the Reagan Associates, have no ownership in the oil and natural gas either produced and saved, or in place in the ground.

It should further be clear that the precise issue in this case is not the payment of the oil and gas taxes. Those taxes have been paid, and will in the future continue to be paid. The point at issue in this case is whether Montana Power Co. and Union Oil Co. can deduct from Barney Reagan's rightful payments here the amounts of those oil and gas taxes.

Prior to October 18, 1954, the Reagan Associates under a contract with Union Oil were entitled to 20% of the net profits derived from production of oil and gas under certain leases on tribal lands, from all formations down to and including the Madison formation, and 15% of the net profits derived from production from all formations under the Madison formation. On October 18, 1954, by written agreement, the Reagan Associates converted the 20%-15% net profits interest in production from said oil and gas leases to a general obligation and liablity of Union Oil Co. and Montana Power Co. based upon 5% of the value of the oil and gas produced from the leased tribal lands.

On October 18, 1954, the Reagan Associates was a group of persons and entities which included Ed Reagan, the father of the plaintiff here, the then governor of Montana, J. Hugo Aronson, J. E. Corette, Jr., either the attorney for or president of the Montana Power Co. at the time, and numerous officers or attorneys of the Montana Power Co. and members of their families.

The underlying leases in which the Reagan Associates had a 20%-15% net profits interest each contained the following language:

> "The lessee hereby agrees that he will not assign or sublet any part of the lands herein leased without the written consent of the lessor and the approval of the Secretary of the Interior. The assignment of this lease or any interest therein without such written consent and approval shall constitute a violation of one of the material and substantial terms and conditions of this lease and be cause of cancellation thereof."

It is therefore clear that if the written agreement of October 18, 1954 converted the 20%-15% net profits interest of the Reagan Associates into an overriding royalty interest, then the agreement should necessarily be submitted to the tribe (the lessor) and the Secretary of the Interior for approval. The attorneys representing Union Oil Co., and the Montana Power Co., and the members of the Reagan Associates themselves recognized that in 1954 such a conversion to an overriding royalty interest would not be approved either by the tribe or by the Secretary of the Interior, but particularly by the latter. The clear intent of the parties was to devise an instrument that did not constitute a transfer of ownership that must be approved by the Secretary of the Interior, but rather to find a way to create a general obligation of Union Oil Co. and Montana Power Co. which would not have to be submitted to the Secretary of the Interior for approval.

Discovery procedures conducted before the District Court here, have yielded letters which shed much light on the intention of the parties with respect to the problem of the agreement. On January 28, 1954, Mr. L. V. Ketter, a Butte attorney, wrote to Mr. J. E. Corette, at the Montana Power

Co., a letter reporting on a meeting of January 22, 1954, in Great Falls, "concerning the conversion of the net profits interest of the Reagan Associates in the production from the Union lands to 5% overriding royalty in the production from Union and Montana lands." In a long dissertation in the letter, Mr. Ketter outlines that an overriding royalty interest would probably be subject to the approval of the Secretary of the Interior, and that the risk involved was cancellation of the tribal leases. Mr. Ketter enclosed copies of the agreement which was executed on October 18, 1954, and stated:

> "If the leases were to be cancelled for the breach of the provisions therein, or of the regulations, requiring prior approval of an assignment of any interest in them, then of course, Union and Montana would lose the respective leaseholds and the Associates would lose not only the overriding royalty but their net profits interest which the royalty interests were to supplant. If the the leases were not cancelled but only the royalty assignments were voided through some action of the government, or the government and the tribe, then there would be a failure of consideration for the surrender of the net profits interest and the latter would probably be reinstated as a matter of law."

Mr. Corette thereafter wrote a letter to Mr. Ketter on March 30, 1954. It is not clear from the letter whether Mr. Corette was wearing the chapeau of J. E. Corette, Jr. one of the Reagan Associates, or the sombrero of an officer or attorney of the Montana Power Co. At any rate however, he said:

> "Union, from its contacts with the Department of the Interior, is satisfied that the Department will not approve any overriding royalty on Indian leases, but will approve net proceeds arrangements comparable to the former arrangement with Reagan Associates. Bert [refers to Bert Gibbons, then general counsel of Union Oil Co.] suggests that we consider the following alternatives:

- 15 -

"1st. Execute the agreement and send it to Reagan Associates with a letter stating that we are not getting approval and that therefore they have no interest in the leases and only the obligation of Montana and Union to pay 5% of the gross income. Under this procedure the question arises as to whether this might be considered a transfer of an interest in the leases which could be used as a basis by the Government for claiming forfeiture of the leases; or

"2nd. Get approval of the Department. Bert thinks there is no possiblity of doing this.

"Bert believes that if we follow Plan No. 1 and if that is agreeable to the Reagan Associates there is probably no great risk from a practical stand-point; that his information from Frary and others is that this is not an unusual procedure.

"Union is willing to go along with Plan No. 1, set forth above, without any approval by the Tribal Counsil or the Department of the Interior."
(Emphasis supplied).

Thereafter, the agreement of October 18, 1954, was executed by the Reagan Associates, acting through attorneys in fact, the Union Oil Co. and the Montana Power Co. Under the written agreement, the Reagan Associates released and quit-claimed forever their interest in the net proceeds [profits] in the leases, and accepted instead "a general obligation and liability of Union and Montana" measured by an amount equal to 5% of the value of the oil produced and saved from the Union and Montana lands. The general obligation and liability continues in force as long as the oil and gas leases remain in effect. The agreement further provided that the Reagan Associates would divide the 5% general obligation and liability among themselves in proportion to their ownership of the 20% net profits interest.

When District Judge Frank E. Blair granted a summary judgment in favor of Barney Reagan in this case, he did so on the ground that no material issue of fact existed, and that "as a matter of law the written contract of the parties of

- 16 -

October 18, 1954, created a general obligation and liability of Union Oil and Montana Power and not any economic interest with respect to the oil or gas in place in the ground. This is fatal to Defendants contentions."

District Judge Frank E. Blair was indubitably correct. His finding is absolutely in accord with the terms of the agreement of October 18, 1954, all of which provide that it is a general obligation and liability of the two companies, and which provisions include a release and quit-claim forever the net profits interest of the Reagan Associates. The reasons for the agreement are clear from the communications between the Montana Power Co., its attorneys, and representatives. By creating a general obligation and liability instead of an overriding royalty interest in the leased lands, the parties avoided the necessity of submitting the agreement for approval to the tribe and to the Secretary of the Interior.

There is no ambiguity in the agreement of October 18, 1954. The intent of the parties is clear that a general obligation and liability against Montana Power Co. and Union Oil Co. was created. The Reagan Associates under the agreement stand in the position of general creditors of the corporations. Because of their release and quit-claim, they are not the owners of any economic interest, overriding royalty interest or other interest in the oil and gas in place, or produced and saved from the tribal lands leased.

Defendants, Montana Power Co. and Union Oil Co. however, have managed to obfuscate the clear issue for the majority of this Court, by raising the specter of the division orders signed by Barney Reagan. I use the term "specter" here

- 17 -

because those persons who have observed such beings report that they are so ethereal that they are easily seen through.

Barney Reagan, the plaintiff here, is the son of Ed Reagan, one of the attorneys - in-fact who executed the instrument here, and of course, one of the Reagan Associates. Barney Reagan succeeded to the interest of Ed Reagan in 1969. In March of 1970, he signed division orders for the Union Oil Co. relating to the division of interest to which he was entitled, 16.66% of 5% of the whole interest. It is the contention of the defendants that the language of the division orders show that Barney Reagan is an overriding royalty interest owner, and not a general creditor of the companies involved.

Each of the division orders, submitted by Union Oil to Barney Reagan, contained the language that the signer certifies and warrants that he is "the legal owner in the proportions set out below of all the oil, and in the proceeds from casinghead gas produced from Union's lease" on the tribals lands. The division order has other printed language on it which is material. It provides that the oil received under the division order shall be paid for by the purchaser (in this case Union) in accordance with the division of interest shown on the face of the division order; the division order is revocable by either party upon thirty days notice; revocation by Barney Reagan, however, would not constitute revocation by any other of the Reagan Associates.

The majority are completely in error that the language of the division order can be used to supplement the terms of the 1954 agreement or to constitute a representation of ownership of the oil and gas by Reagan.

First, under the agreement of October 18, 1954, the Reagan Associates forever release and quit-claimed their net profits interest in the oil and gas leases. No matter what Barney Reagan warranted or represented in the division order, he cannot become an owner of an overriding royalty interest in those leases unless there is an instrument deeding back to him from Union and Montana Power Co. such an interest. None appears here.

Secondly, the majority miss or confuse the purpose of a division order.

> "A division order is an instrument prepared by the purchaser of oil and gas which directs to whom and in what proportion the purchase price is to be paid. Primarily, it is for the protection of the purchaser of the oil. . ." Sullivan, Handbook of Oil and Gas Law (1955), p. 140

And Sullivan further states:

> ". . .A division order is separate and distinct from a conveyance of unaccrued royalty. It merely directs to whom payments should be made for oil that has already been produced. A division order does not supersede the lease by operating as a novation as to the royalty." Sullivan, supra, pp. 141-142.

(Sullivan, it should be noted, served for many years as Dean of the Law School at the University of Montana. He then became Vice-President and General Counsel of Montana Power Co. He did not participate in this case.)

Sullivan is of course in accord with the law on the purpose and effect of division orders. Such instruments determine who is entitled to payment for the sale and purchase of oil and gas, and in what proportions. As stated in Phillips Petroleum Co. v. Williams (5th Cir. 1946) 158 F.2d 723, 727:

> "As to contention one, the division and transfer orders, with their definite declaration that the

market value of the gas at the mouth of the well is to be the measure of lessors' rights and lessee's obligations, and their clear and full provision for precisely arriving at the value, we agree with defendant, that, until withdrawn or modified, they constitute the precise and definite basis for payments, and payments made in accordance with them are final and binding. The very existence of this and the numerous other litigations which have arisen over the meaning and effect of market price or rate provisions and over what was the market price or value of the gas, and the fact that these agreements fix, as due, sums which may from time to time be more or less than the prevailing market price, give full support to and make binding payments and settlements made thereunder. Binding as they are, however, in respect of payments made and accepted under them, these divisons or transfer orders did not rewrite or supplant the lease contract. They are binding only for the time and to the extent that they have been, or are being acted on and made the basis of settlements and payments. . ."

In Maddox v. Gulf Oil Corp. (Kansas 1977), 222 Kan. 733, 567 P.2d 1326, 1328 it is said:

". . .The insertion in the division orders of matters contrary to the oil and gas leases, or contrary to the law, cannot be unilaterally imposed upon the lessor by the lessee or the purchaser. Here the unilateral attempt by Gulf in the division orders to amend the oil and gas leases, and thereby deprive the royalty owners of interest to which they were otherwise entitled, was without consideration. Therefore, the provisions of the division order regarding waiver of interest are null and void as determined by the trial court."

It is therefore clear from the cases the division orders signed by Barney Reagan could have no legal effect on his rights under the agreement of October 18, 1954. Therefore no material issue of fact exists with respect to those division orders. Judge Blair's summary judgment ought to be affirmed in toto.

_John C. Shuby_
Justice

We join in the dissent of Justice John C. Sheehy.

_Daniel J. Shea_
Justice Daniel J. Shea

_Frank B. Morrison, Jr._
Justice Frank B. Morrison, Jr.

- 20 -